**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, v. ROBERT COLLAZO, AKA Weasel, *Defendant-Appellant.* | No. 15-50509 D.C. No. 3:13-cr-04514-BEN-7 |

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, v. LINO DELGADO-VIDACA, AKA Leonard Delgado, AKA Spanky, *Defendant-Appellant.* | No. 16-50048 D.C. No. 3:13-cr-04514-BEN-1 |

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, v. JULIO RODRIGUEZ, AKA Sniper, *Defendant-Appellant.* | No. 16-50117 D.C. No. 3:13-cr-04514-BEN-4 |

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

STEVEN AMADOR, AKA Gordo,
AKA Insane,
*Defendant-Appellant.*

No. 16-50195

D.C. No.
3:13-cr-04514-
BEN-2

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

ISAAC BALLESTEROS, AKA Lazy,
*Defendant-Appellant.*

No. 16-50345

D.C. No.
3:13-cr-04514-
BEN-3

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the Southern District of California
Roger T. Benitez, District Judge, Presiding

Argued and Submitted En Banc January 13, 2020
Pasadena, California

Filed December 2, 2020
Amended January 14, 2021

Before: Sidney R. Thomas, Chief Judge, and William A. Fletcher, Consuelo M. Callahan, Milan D. Smith, Jr., Sandra S. Ikuta, Jacqueline H. Nguyen, Paul J. Watford, Andrew D. Hurwitz, Eric D. Miller, Bridget S. Bade and Daniel A. Bress, Circuit Judges.

Order;
Opinion by Judge Ikuta;
Dissent by Judge W. Fletcher

## SUMMARY[*]

### Criminal Law

In appeals by five defendants who were convicted of conspiracy to distribute controlled substances under 21 U.S.C. §§ 846 and 841, the en banc court clarified the requirements for conspiracy under § 846 and the facts that trigger the penalties under 21 U.S.C. §§ 841(b)(1)(A)–(B).

The en banc court explained that to convict the defendants of conspiracy under § 846 in this case, the government must prove beyond a reasonable doubt that each defendant agreed with another person that some member of the conspiracy would commit the relevant underlying offense (here 21 U.S.C. § 841(a)), and that each defendant had the requisite intent for a § 841(a) conviction.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The en banc court held that in order to obtain a particular sentence under 21 U.S.C. § 841(b)(1)(A)(viii) and § 841(b)(1)(B)(i) for a violation of § 841(a), the government must prove beyond a reasonable doubt the specific type and the quantity of substance involved in the offense, but not the defendant's knowledge (or intent) with respect to that type and drug quantity.

The en banc court clarified that a conviction under § 846 does not require proof of a level of criminal intent greater than that required for the underlying offense merely because it is a conspiracy conviction. The en banc court concluded that to obtain a conviction and particular sentence for conspiracy to distribute controlled substances under § 846, the government must prove only that the defendant's mental state was the same as if the defendant had been charged with the underlying offense; the government need not prove the defendant's knowledge (or intent) with respect to the drug type and quantity under § 841(b).

The en banc court overruled *United States v. Becerra*, 992 F.2d 960 (9th Cir. 1993), and its progeny to the extent they depart from this decision. The en banc court explained that this court's error in *Becerra* and its progeny was the failure to recognize that the rule of coconspirator liability for substantive offenses in *Pinkerton v. United States*, 328 U.S. 640 (1946), which was incorporated into the Sentencing Guidelines and applied regardless of whether the charge was conspiracy or a substantive offense, does not apply to the liability determination for a § 846 conspiracy offense.

Applying this approach to the case on appeal, the en banc court held that the district court's instruction—requiring the jury to determine "whether the government proved beyond a

reasonable doubt that the amount of [the specified drug] that was reasonably foreseeable to [each defendant] or fell within the scope of his particular agreement equaled or exceeded" a specified amount—was erroneous.

The en banc court remanded to the three-judge panel to reconsider the harmless error issue and the balance of the issues raised by the parties in light of this opinion, and to enter an appropriate judgment.

Judge W. Fletcher—joined by Chief Judge Thomas and Judges Nguyen, Watford, and Hurwitz—dissented. Noting that any fact that by law increases the penalty for a crime is an element that must be submitted to the jury and proved beyond a reasonable doubt, and that there is a strong presumption that Congress intends to require a culpable *mens rea* as to every element of a crime, Judge Fletcher would hold that when the government seeks enhanced penalties under §§ 841(b)(1)(A) or (b)(1)(B), it must prove the defendant "knowingly or intentionally" distributed the actual controlled substance and quantity charged under §§ 841(b)(1)(A) or (b)(1)(B).

**COUNSEL**

Benjamin L. Coleman (argued), Coleman & Balogh LLP, San Diego, California; Timothy A. Scott and Nicolas O. Jimenez, Scott Trial Lawyers APC, San Diego, California; for Defendant-Appellant Steven Amador.

John C. Lemon, San Diego, California, for Defendant-Appellant Julio Rodriguez.

Martin G. Molina, Law Office of Martin G. Molina, San Diego, California, for Defendant-Appellant Lino Delgado-Vidaca.

Gary P. Burcham, Burcham & Zugman, San Diego, California, for Defendant-Appellant Robert Collazo.

Victor N. Pippins, Higgs Fletcher & Mack, San Diego, California, for Defendant-Appellant Isaac Ballesteros.

Daniel E. Zipp (argued), Assistant United States Attorney; Helen H. Hong, Chief, Appellate Section, Criminal Division; Robert S. Brewer Jr., United States Attorney; United States Attorney's Office, San Diego, California; for Plaintiff-Appellee.

Kimberly S. Trimble and Vincent J. Brunkow, Federal Defenders of San Diego Inc., San Diego, California; Rich Curtner, Federal Public Defender, Anchorage, Alaska; Michael Filipovic, Federal Public Defender, Seattle, Washington; Anthony Gallagher, Federal Defenders of Montana, Great Falls, Montana; Andrea George, Federal Defenders of Eastern Washington and Idaho, Spokane, Washington; John T. Gorman, Office of the Federal Public Defender, Mongmong,

Guam; Lisa Hay, Federal Public Defender, Portland, Oregon; Steven Kalar, Office of the Federal Public Defender, San Francisco, California; Amy Karlin, Office of the Federal Public Defender, Los Angeles, California; Dick Rubin, Federal Defender Services of Idaho, Boise, Idaho; Jon Sands, Federal Public Defender, Phoenix, Arizona; Heather Williams, Office of the Federal Defender, Sacramento, California; Peter Wolff, Federal Public Defender, Honolulu, Hawaii; for Amici Curiae Ninth Circuit Federal Public and Community Defenders.

Jeffrey L. Fisher, O'Melveny & Myers LLP, Menlo Park, California; Ashley Robertson, O'Melveny & Myers LLP, Washington, D.C.; for Amicus Curiae National Association of Criminal Defense Lawyers.

## ORDER

The opinion filed on December 2, 2020, appearing at 982 F.3d 596 (9th Cir. 2020), is amended as follows:

At page 605, footnote 3, replace:

<Defense counsel for each defendant expressly joined this argument, except Delgado-Vidaca's counsel.>

with

<The district court assumed that the defense counsel for each defendant joined this argument.>.

At page 624, remove footnote 31.

\*\*\*

Defendants-Appellants' Petition for Rehearing by Full Court (ECF No. 185) was circulated to the judges of the court, and no judge requested a vote for full court en banc consideration. The Petition for Rehearing by Full Court is **DENIED**. With this amendment, no further petitions for rehearing or rehearing en banc may be filed.

---

## OPINION

IKUTA, Circuit Judge:

Five defendants convicted of conspiracy to distribute controlled substances under 21 U.S.C. §§ 846 and 841 challenge jury instructions that required the jury to determine "whether the government proved beyond a reasonable doubt that the amount of [the specified drug] that was reasonably foreseeable to [each defendant] or fell within the scope of his particular agreement equaled or exceeded" a specified amount. We conclude that this instruction was erroneous. After a defendant is convicted of conspiracy under § 846 to distribute controlled substances in violation of § 841(a)(1), the government may establish that the defendant is subject to the penalties in § 841(b)(1)(A)(viii) and § 841(b)(1)(B)(i) by proving beyond a reasonable doubt that the § 841(a)(1) offense involved the drug type and quantity set forth in the two penalty provisions. The government is not required to prove that the defendant knew (or had an intent) with respect to the drug type and quantity set forth in those penalty provisions in order for them to apply.

I

Robert Collazo, Lino Delgado-Vidaca, Julio Rodriguez, Steven Amador, and Isaac Ballesteros are members of the Mexican Mafia, "the largest prison gang in the United States." *United States v. Rodriguez*, 851 F.3d 931, 936 (9th Cir. 2017). It was "formed in the 1950s by Hispanic street gang members" for the purpose of protecting "Hispanics from other such gangs within California's jails and prisons." *United States v. Shryock*, 342 F.3d 948, 961 (9th Cir. 2003). Over time, it "gained significant power and control over illegal activities in the California prison system." *Id.* As members were released from prison, the organization extended its dominion to certain parts of Southern California. *Id.* Outside the prison walls, the Mexican Mafia demands payments (called "taxes") from local drug dealers and street gangs in exchange for allowing them to distribute and sell drugs in its territory. *Rodriguez*, 851 F.3d at 936.

The Mexican Mafia has a hierarchical structure. *United States v. Martinez*, 657 F.3d 811, 815 (9th Cir. 2011). At the top of the structure are the "made members" who are independently responsible for their own territory. Each made member has a "secretary" who ensures that the member's decisions are implemented. Further down the hierarchy are the "meseros" who are responsible for making tactical decisions, such as when to initiate prison riots, and for overseeing the organization's criminal activities within a particular prison yard. The lower level participants are referred to as "associates." The primary duty of an associate is to generate money for the Mexican Mafia through the distribution and sale of narcotics. Whether narcotics are sold in prison or on the street, every transaction is conducted on

behalf of the made member who controls the particular territory.

The five defendants in this appeal worked for Luis "Boo-Boo" Garcia, a made member of the Mexican Mafia who is serving a life sentence at Pelican Bay State Prison in Northern California. Each defendant had a defined role in the organization. Robert Collazo was in charge of a prison yard at Donovan Prison, and was responsible for coordinating narcotics being smuggled into prison on a regular basis: methamphetamine was smuggled by the ounce (roughly 28 grams), and heroin was smuggled by the piece (roughly 24 grams). Once the narcotics were smuggled into prison, Collazo worked with various Mexican Mafia members, including Ballesteros, to transfer those narcotics throughout the prison. Collazo also sent Garcia $400 every month. Lino Delgado-Vidaca, a Mexican Mafia member who had been released from prison, collected taxes from drug dealers in San Diego and conveyed payments to Garcia through Garcia's fiancée. Julio Rodriguez was initially incarcerated at Lancaster State Prison and then transferred to Ironwood State Prison. He was responsible for smuggling heroin into both prisons. Rodriguez smuggled heroin in 50-gram increments; each delivery included one 25-gram bag and two 12.5-gram bags. Steven Amador, who was incarcerated at Centinela State Prison, served as Garcia's secretary. His primary responsibility was collecting rent on behalf of Garcia. Amador also helped smuggle narcotics into Centinela. Isaac Ballesteros was incarcerated at Donovan State Prison. As a mesero, he oversaw distribution and tax collection in one of the prison yards.

Following a significant investigation by a joint state and federal gang task force, the defendants were arrested and

charged with two counts of conspiracy. We are concerned only with the second count: conspiracy to distribute controlled substances, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(viii), 841(b)(1)(B)(i), and 846.[1] The indictment did not charge any defendant with a substantive offense related to this conspiracy count.

After a ten-day trial, the parties agreed to jury instructions and verdict forms. For Count 2 (conspiracy to distribute controlled substances), the jury was instructed as follows:

> The defendants are charged in Count 2 of the indictment with conspiracy to distribute controlled substances in violation of Section 841(a) and Section 846 of Title 21 of the United States Code. In order for a defendant to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt:
>
>> First, beginning on a date unknown and continuing up to and including March 2013, there was an agreement between two or more persons to distribute methamphetamine or heroin; and

---

[1] The indictment specifically alleged that the defendants "did knowingly and intentionally conspire . . . to distribute: 50 grams and more of actual methamphetamine, a Schedule II Controlled Substance; 500 grams and more of a mixture containing methamphetamine, a Schedule II Controlled Substance; and 100 grams and more of heroin, a Schedule II Controlled Substance." The indictment also alleged a RICO conspiracy, in violation of 18 U.S.C. § 1962(d), and criminal forfeiture, pursuant to 18 U.S.C. § 1963.

> Second, the defendant joined in the agreement knowing of its purpose and intending to help accomplish that purpose.

If the jury found a defendant guilty of conspiracy to distribute controlled substances, the jury was instructed to make special findings regarding drug quantity:

> If you find a defendant guilty of the charge in Count 2 of the indictment, you are then to determine as to that defendant whether the government proved beyond a reasonable doubt that the amount of methamphetamine that was reasonably foreseeable to him or fell within the scope of his particular agreement equaled or exceeded 50 grams of actual methamphetamine or 500 grams of a mixture containing methamphetamine in connection with his criminal activity. Your decision as to weight must be unanimous.

> If you find a defendant guilty of the charge in Count 2 of the indictment, you are then to determine as to that defendant whether the government proved beyond a reasonable doubt that the amount of heroin that was reasonably foreseeable to him or fell within the scope of his particular agreement equaled or exceeded 100 grams of heroin in connection with his criminal activity. Your decision as to weight must be unanimous.

During deliberation, the jury returned a note asking for clarification on its duty to make special findings regarding

drug quantity.[2] Only then did defense counsel raise his concern that the jury instructions were not in accordance with Ninth Circuit precedent. Relying on *United States v. Ortiz*, 362 F.3d 1274 (9th Cir. 2004), defense counsel argued that the drug-quantity instruction should be phrased in the conjunctive (reasonably foreseeable to him *and* fell within the scope of his particular agreement), rather than in the disjunctive (reasonably foreseeable to him *or* fell within the scope of his particular agreement).[3] After a brief recess, the trial court ruled that *Ortiz* was not applicable, because it interpreted the United States Sentencing Guidelines (the "Guidelines"), rather than the relevant criminal statutes; therefore, the court declined to change the jury instructions.

The jury found each defendant guilty of conspiracy to distribute controlled substances.[4] As for the special findings regarding drug quantity under § 841(b)(1)(A)–(B), the jury found the requisite methamphetamine amount for Collazo and Delgado-Vidaca, and the requisite heroin amount for

---

[2] The note read:

> *Count 2*. If we find the defendant guilty on Count 2 "foreseeable to him or fell within the scope of his particular agreement equal to or exceeded 50 grams of pure meth or 500 grams of a mixture . . ."
>
> Q[:] Does this mean we have to determine if each defendant individually met the 50/500 gram requirement?

[3] The district court assumed that the defense counsel for each defendant joined this argument.

[4] The jury also found each defendant guilty of participating in the RICO conspiracy.

Amador, Ballesteros, Collazo, and Rodriguez.    Each
defendant timely appealed, raising multiple claims of error,
including a challenge to the jury instructions for Count 2.[5]

At the suggestion of the three-judge panel initially
assigned the consolidated appeals, we voted to hear the
appeals en banc to clarify our jury instructions for conspiracy
under § 846 and the facts that trigger the penalties under
§ 841(b)(1)(A)–(B).[6]  As explained in more detail below, our
prior decisions on this issue relied on the Guidelines'
definition of "relevant conduct," *see* U.S.S.G. § 1B1.3
(1991), to determine a defendant's liability for conspiracy
under 21 U.S.C. § 846 and the appropriate penalty under
21 U.S.C. § 841. *See United States v. Torres*, 869 F.3d 1089,
1097–98 (9th Cir. 2017).  After the Sentencing Commission
revised the Guidelines' definition of "relevant conduct," we
recognized it was necessary to resolve en banc how this
change affected our interpretation of § 846 and § 841. *Id.* We
now conclude that the Guidelines' definition of "relevant
conduct" is not applicable to our interpretation of § 846 or
§ 841.  As a result, we must overrule our precedent and begin
anew to determine what the government must prove to secure
a conviction and sentence under §§ 846 and 841(b).

We have jurisdiction under 28 U.S.C. § 1291.    "We
review de novo whether the jury instructions accurately
define the elements of a statutory offense." *United States v.
Hicks*, 217 F.3d 1038, 1045 (9th Cir. 2000).

---

[5] Ballesteros did not join his co-defendants in challenging the jury
instructions on appeal until we requested supplemental briefing.

[6] We address only this issue, and return the appeals to the three-judge
panel to address the remaining issues.

II

In determining whether the jury instructions accurately defined each element of a § 846 conspiracy to distribute controlled substances in violation of § 841, we begin by explaining the legal framework for these offenses.

A

The defendants were charged with conspiracy under 21 U.S.C. § 846, which provides: "Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy." The pertinent offense in this case is set forth in 21 U.S.C. § 841(a)(1), and the penalties prescribed for this offense are set forth in 21 U.S.C. § 841(b)(1)(A)–(B). Although the defendants were not charged with any substantive offenses under § 841(a)(1), this section and § 841(b) are relevant to determining the elements of the § 846 conspiracy convictions here.

In enacting § 846, Congress adopted the common law understanding of conspiracy. *United States v. Shabani*, 513 U.S. 10, 13–14 (1994). Therefore, our interpretation of § 846 is guided by well-established principles of conspiracy law. *See Ocasio v. United States*, 136 S. Ct. 1423, 1429 (2016) (stating that the general federal conspiracy statute's "use of the term 'conspire' incorporates long-recognized principles of conspiracy law").

First, the essence of conspiracy "is an agreement to commit an unlawful act." *Iannelli v. United States*, 420 U.S. 770, 777 (1975); *see also Ocasio*, 136 S. Ct. at 1429 ("A

defendant must merely reach an agreement with the specific intent that the underlying crime be committed by some member of the conspiracy." (internal quotation marks and emphasis omitted)).  The agreement itself is the offense, and it is not necessary for the government to prove that the defendant or other participants committed the unlawful object of the conspiracy.[7]  *See Salinas v. United States*, 522 U.S. 52, 65 (1997).  The government is not required to prove every detail of the agreement.  *See, e.g.*, *United States v. Sharif*, 817 F.2d 1375, 1378 (9th Cir. 1987) (rejecting the argument that "there can be no conspiracy without proof of . . . such terms as price, quantity, and time, place, and manner of delivery").  Rather, a fact-finder may infer the existence and scope of the agreement from the facts and circumstances established at trial.  *Iannelli*, 420 U.S. at 777 n.10; *United States v. Espinoza-Valdez*, 889 F.3d 654, 656 (9th Cir. 2018).  "Once the existence of the conspiracy is shown, evidence establishing beyond a reasonable doubt a knowing connection of the defendant with the conspiracy, even though the connection is slight, is sufficient to convict him of knowing participation in the conspiracy."  *United States v. Meyers*, 847 F.2d 1408, 1413 (9th Cir. 1988).  At minimum, the government must "show that each defendant knew or had a reason to know of the scope of the conspiracy and that each defendant had reason to believe that their own benefits were

---

[7] Nor does the government have to prove that the defendant or a coconspirator took an overt act in furtherance of the agreement.  *See Whitfield v. United States*, 543 U.S. 209, 213–14 (2005).  This distinguishes § 846 from the general federal conspiracy statute, 18 U.S.C. § 371, which requires proof of an agreement among two or more persons to commit an offense against the United States and that "one or more of such persons do any act to effect the object of the conspiracy."

dependent upon the success of the entire venture."[8] *United States v. Lapier*, 796 F.3d 1090, 1095 (9th Cir. 2015) (quoting *United States v. Kostoff*, 585 F.2d 378, 380 (9th Cir. 1978) (per curiam)). When the government proves that a defendant had a knowing connection with an extensive enterprise (such as a drug trafficking organization) and had reason to know of its scope, a fact-finder may infer that the defendant agreed to the entire unlawful scheme.[9] *See United States v. Smith*, 609 F.2d 1294, 1300 (9th Cir. 1979); *see also United States v. Tarantino*, 846 F.2d 1384, 1393 (D.C. Cir. 1988) (applying similar principles in a case involving several defendants who were alleged members of an extensive drug conspiracy).

Second, the government must prove that the defendant had the "intent to effectuate the object of the conspiracy." *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 443 n.20 (1978); *see also Salinas*, 522 U.S. at 65 ("A conspirator must intend to further an endeavor which, if completed, would

---

[8] "Although conspirators must pursue the same criminal objective, a conspirator need not agree to commit or facilitate each and every part of the substantive offense." *Ocasio*, 136 S. Ct. at 1429 (internal quotation marks omitted and alteration adopted).

[9] A defendant convicted of conspiracy may also be held criminally liable for substantive offenses committed by other members of the conspiracy, so long as the offenses were reasonably foreseeable and committed in furtherance of the conspiracy. *See Pinkerton v. United States*, 328 U.S. 640, 647–48 (1946); *United States v. Sullivan*, 522 F.3d 967, 977 (9th Cir. 2008) (per curiam). Such liability is not at issue here. The rule of coconspirator liability under *Pinkerton* applies when the government charges a defendant with substantive offenses that were committed by other members of the conspiracy, *see Pinkerton*, 328 U.S. at 647–48, not when the government charges a defendant with the crime of conspiracy itself, *see id.* at 645.

satisfy all of the elements of a substantive criminal offense."). The Supreme Court has established that "in order to sustain a judgment of conviction on a charge of conspiracy to violate a federal statute, the Government must prove at least the degree of criminal intent necessary for the substantive offense itself." *United States v. Feola*, 420 U.S. 671, 686 (1975).

Applying the foregoing framework to § 846, in order to convict a defendant of conspiracy, the government must prove beyond a reasonable doubt that (1) the defendant agreed with another person that some member of the conspiracy would commit the relevant underlying offense (here § 841(a)), and that (2) the defendant had the requisite intent necessary for a conviction of the underlying offense.[10] If the government satisfies its burden, the defendant "shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."  21 U.S.C. § 846.

B

We now turn to the underlying offense at issue here, 21 U.S.C. § 841(a)(1), and the penalties prescribed for that offense under § 841(b)(1)(A)–(B).  In particular, we focus on determining the requisite intent necessary for a conviction of § 841(a) and the imposition of the penalties under § 841(b)(A)–(B).

---

[10] For a conspiracy offense under § 846, the government need not prove a level of criminal intent greater than that for the underlying offense, *see infra* Section III.  Because the government need not prove that a defendant knew (or had an intent) with respect to a specific drug type and quantity in order to secure a conviction under § 841(a) and penalties under § 841(b)(1), *see infra* Section II.B, the government likewise need not prove such knowledge or intent for purposes of § 846.

1

Section 841(a)(1) is straightforward.  It states, "Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance."  The text of the statute requires the government to prove beyond a reasonable doubt that the defendant (1) knowingly or intentionally (2) distributed[11] (3) any "controlled substance," which is defined as "a drug or other substance, or immediate precursor, included in" schedules I–V listed in 21 U.S.C. § 812.  *See* 21 U.S.C. § 802(6); *see also McFadden v. United States*, 576 U.S. 186, 192 (2015) (holding that as used in § 841(a)(1), the phrase "a controlled substance" means "some unspecified substance listed on the federal drug schedules").

Section 841(a) does not prescribe any penalties.  Instead, "any person who violates [§ 841(a)] shall be sentenced" pursuant to § 841(b), which sets out the applicable penalties when the violation involves specified predicate facts.  Two penalty provisions in § 841(b) are at issue here, one for offenses involving methamphetamine and one for those involving heroin.  The methamphetamine provision states:

> [A]ny person who violates subsection (a) of this section shall be sentenced as follows:
>
>> (1)(A) In the case of a violation of subsection (a) of this section involving—

---

[11] For convenience, we use the term "distribute" and its variations to refer collectively to the actions prohibited by § 841(a)(1).

. . .

> (viii) 50 grams or more of methamphetamine, its salts, isomers, and salts of its isomers or 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers;

> such person shall be sentenced to a term of imprisonment which may not be less than 10 years or more than life and if death or serious bodily injury results from the use of such substance shall be not less than 20 years or more than life, a fine not to exceed the greater of that authorized in accordance with the provisions of Title 18 or $10,000,000 if the defendant is an individual or $50,000,000 if the defendant is other than an individual, or both.

21 U.S.C. § 841(b)(1)(A)(viii).  The heroin provision has the same structure, but applies to offenses involving "100 grams or more of a mixture or substance containing a detectable

amount of heroin" and imposes different terms of imprisonment and fine amounts.[12]     21 U.S.C. § 841(b)(1)(B)(i).

Before the Supreme Court's decision in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), a defendant could be sentenced "pursuant to a finding made by a judge . . . under a preponderance of the evidence standard" because we understood the drug type and quantity in § 841(b) to be a "sentencing factor, not an element of the crime." *United States v. Nordby*, 225 F.3d 1053, 1058 (9th Cir. 2000), *overruled by United States v. Buckland*, 289 F.3d 558, 568 (9th Cir. 2002) (en banc); *see also Buckland*, 289 F.3d at 564 & n.2 (stating that "before *Apprendi* virtually everyone routinely treated drug quantity under § 841 as a 'sentencing factor' that need not be found beyond a reasonable doubt by a properly instructed jury").

---

[12] 21 U.S.C. § 841(b)(1)(B)(i) states:

> (B) In the case of a violation of subsection (a) of this section involving–
>
>> (i) 100 grams or more of a mixture or substance containing a detectable amount of heroin;
>
> . . .
>
> such person shall be sentenced to a term of imprisonment which may not be less than 5 years and not more than 40 years and if death or serious bodily injury results from the use of such substance shall be not less than 20 years or more than life, a fine not to exceed the greater of that authorized in accordance with the provisions of Title 18 or $5,000,000 if the defendant is an individual or $25,000,000 if the defendant is other than an individual, or both.

This changed after *Apprendi* and *Alleyne v. United States,* 570 U.S. 99 (2013). As explained in *Alleyne*, the Sixth Amendment "provides that those accused of a crime have the right to a trial by an impartial jury," and "[t]his right, in conjunction with the Due Process Clause, requires that each element of a crime be proved to the jury beyond a reasonable doubt." 570 U.S. at 104 (cleaned up). To ensure this right, it is necessary to make a "proper designation of the facts that are elements of the crime." *Id.* at 104–05. In this context, *Apprendi* held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum" constitutes an element of the crime that "must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. *Alleyne* expanded on *Apprendi*, and held that any fact which increases a mandatory minimum also "constitutes an 'element' or 'ingredient' of the charged offense" and must be submitted to the jury. 570 U.S. at 107–08.

Under *Alleyne*'s reasoning, the facts of drug type and quantity under § 841(b) constitute elements or ingredients of the crime because they affect the penalty that can be imposed on a defendant. Therefore, "in order to save [the] statute from unconstitutionality," we reinterpreted § 841 as requiring such facts to be proved beyond a reasonable doubt to the jury. *Buckland*, 289 F.3d at 564–68 (citation omitted). As made clear in *Apprendi* and *Alleyne*, however, the purpose of *Buckland*'s requirement is to protect a defendant's Sixth and Fifth Amendment rights. We treat drug type and quantity as elements under section 841(b)(1) only for these constitutional purposes. *See United States v. Toliver*, 351 F.3d 423, 430

(9th Cir. 2003), *abrogated on other grounds by Blakely v. Washington*, 542 U.S. 296 (2004).**[13]**

Because *Apprendi* and *Alleyne* "did not rewrite § 841(b) to add a new mens rea requirement," *United States v. Dado*, 759 F.3d 550, 570 (6th Cir. 2014), they do not assist us in determining the requisite mens rea necessary for the imposition of penalties under § 841(b)(1)(A)–(B), the issue now before us. Section 841(b)(1), unlike § 841(a), is silent as to any mens rea requirement. We must therefore determine whether Congress intended to require proof of a defendant's mens rea with respect to the requisite drug type and quantity for the penalties in § 841(b)(1)(A)–(B) to apply. We turn to that issue next.

2

Section 841(a) makes it unlawful for anyone to "knowingly or intentionally" commit the offense of distributing a controlled substance. We must therefore decide "how far down" the text of the statute "the word 'knowingly' is intended to travel." *Liparota v. United States*, 471 U.S. 419, 424 n.7 (1985) (quoting W. LaFave & A. Scott, Criminal Law § 27 (1972)).

---

**[13]** The dissent argues that *Alleyne* "reflects a broad concern about the unfairness of sentencing schemes in which the facts that are legally essential to the punishment need not be found beyond a reasonable doubt." Dissent at 66. Contrary to the dissent, *Alleyne* did not hold that it was generally *unfair* for the district court to find facts that could increase the sentence for a "legally prescribed offense" by a preponderance of evidence. *See Alleyne,* 570 U.S. at 117. Rather, *Alleyne* held that it was *unconstitutional* (a violation of the Sixth and Fifth Amendment) for the court to find such a fact. *Id.*

In determining whether Congress intended a mens rea requirement in a criminal statute to apply to noncontiguous words or phrases, the Supreme Court uses ordinary tools of statutory interpretation. The Court starts "as always, with the language of the statute," *Dean v. United States*, 556 U.S. 568, 572 (2009) (quoting *Williams v. Taylor*, 529 U.S. 420, 431 (2000)), and considers the natural reading of the language using "ordinary English grammar," *Flores-Figueroa v. United States*, 556 U.S. 646, 650 (2009). In *Flores-Figueroa*, for instance, the Court considered the language in 18 U.S.C. § 1028A(a)(1)—which punishes "[w]hoever . . . knowingly . . . uses . . . a means of identification of another person"—to determine whether "knowingly" applied to "means of identification of another person."[14]  556 U.S. at 650. The Court held it did.  *Id.* at 657.  The statute's adverb ("knowingly") was placed before a transitive verb ("uses") that has an object ("a means of identification of another person").  *Id.* at 650–51. Accordingly, it was "natural to read" this statutory language as establishing "how the subject performed the entire action, including the object as set forth in the sentence." *Id.*; *see also Rehaif v. United States*, 139 S. Ct. 2191, 2195 (2019) (holding that the term "knowingly" in § 924(a)(2)—which imposes penalties on a person who "knowingly violates" certain subsections—"modifies the verb

---

[14] Section 1028A(a)(1) states that:

> Whoever, during and in relation to any felony violation enumerated in subsection (c), *knowingly* transfers, possesses, or uses, without lawful authority, *a means of identification of another person* shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of 2 years.

(emphasis added).

'violates' and its direct object," including a separate, cross-referenced statutory provision, 18 U.S.C. § 922(g)).**[15]**

This rule is not rigid: the word "knowingly" does not necessarily apply to every word in "a long statutory phrase, such that questions may reasonably arise about how far into the statute the modifier extends." *Rehaif*, 139 S. Ct. at 2196; *see also United States v. Taylor*, 239 F.3d 994, 997 (9th Cir. 2001) (holding that the word "knowingly" in 18 U.S.C. § 2423(a), which makes it unlawful to "knowingly transpor[t] an individual who has not attained the age of 18 years in interstate or foreign commerce . . . with intent that the individual engage in prostitution," does not require the

---

**[15]** 18 U.S.C. § 924(a)(2) provides:

> Whoever knowingly violates subsection (a)(6), (d), (g), (h), (i), (j), or (o) of section 922 shall be fined as provided in this title, imprisoned not more than 10 years, or both.

18 U.S.C. § 922(g)(5)(A) provides:

> (g) It shall be unlawful for any person— . . .
>
> > (5) who, being an alien—(A) is illegally or unlawfully in the United States . . . to . . . possess . . . any firearm or ammunition . . . .

The Court read the word "knowingly" from § 924(a)(2) into § 922(g) and then applied the "knowingly" requirement to each of the elements in the statutory sentence in § 922(g)(5)(A) "that make a defendant's behavior criminal." *Rehaif*, 139 S. Ct. at 2196.

government to prove that the defendant knew the victim's age).[16]

The Court also considers the "surrounding text and structure." *Maracich v. Spears*, 570 U.S. 48, 76 (2013). In *Dean*, for instance, the Court interpreted 18 U.S.C. § 924(c), which provides:

> [A]ny person who, during and *in relation to* any crime of violence or drug trafficking crime . . . uses or carries a firearm, or who, *in furtherance of* any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime—
>
> > (i) be sentenced to a term of imprisonment of not less than 5 years;
> >
> > (ii) if the firearm *is brandished*, be sentenced to a term of imprisonment of not less than 7 years; and
> >
> > (iii) if the firearm *is discharged*, be sentenced to a term of imprisonment of not less than 10 years.

---

[16] Contrary to the dissent's assertion, the Court does not count the number of words between the mens rea requirement and an element of the crime to aid its determination as to whether to apply the mens rea requirement. Dissent at 59–60. Rather, the Court begins by considering the natural reading of the statute using ordinary English grammar, and a grammatical sentence can nevertheless be quite long. *See, e.g.*, Thomas R. Haggard, *Justifiably Long Sentences*, S.C. Law. Feb. 2000, at 11.

556 U.S. at 571 (quoting 18 U.S.C. § 924(c)(1)(A)) (emphasis added).  The Court held that there is no intent requirement with respect to subsection (iii).  *Id*. at 572–73.  Although "Congress expressly included an intent requirement for [subsection (ii)]" by defining "brandish" in 18 U.S.C. § 924(c)(4) to mean "to display all or part of the firearm . . . in order to intimidate that person," it did not define "discharge" to include such an intent requirement.  *Id*. (emphasis omitted).  "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Id.* at 573 (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)).

In addition to considering the text and structure of the statute, the Court recognizes the presumption, traceable to the common law, that "Congress intends to require a defendant to possess a culpable mental state regarding each of the statutory elements that criminalize otherwise innocent conduct."  *Rehaif*, 139 S. Ct. at 2195 (citation omitted).  In applying this background principle, the Court has differentiated between statutes that are silent on mens rea, and those that include a mens rea requirement.  Where a criminal statute is entirely silent on the mens rea required for a criminal offense, the Court presumes that Congress did not intend to "dispense with a conventional mens rea element, which would require that the defendant know the facts that make his conduct illegal."  *Staples v. United States*, 511 U.S. 600, 605 (1994).  In such cases, the Court deems the presumption of mens rea to be rebutted only when there is a strong indication that Congress has created "'public welfare' or 'regulatory' offenses" and imposed "a form of strict criminal liability through statutes that do not require the

defendant to know the facts that make his conduct illegal." *Id*. at 606. Where a statute includes a mens rea requirement, such as § 841, we are not faced with the question whether Congress intended to dispense with a mens rea requirement entirely, as in *Staples*; rather, we must determine "how far into the statute [does § 841(a)'s "knowingly"] modifier extend[]." *Rehaif*, 139 S. Ct. at 2196.[17]

The presumption that Congress intended the defendant to possess a culpable mental state as to "each of the statutory elements that criminalize otherwise innocent conduct," *id.* at 2195 (quoting *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 72 (1994)), is particularly appropriate when a different reading would have the effect of criminalizing "a broad range of apparently innocent conduct," *X-Citement Video*, 513 U.S. at 71 (citation omitted). Thus, in *X-Citement Video*, the Court concluded that the word "knowingly" in "knowingly transports . . . any visual depiction, if . . . such visual depiction involves the use of a minor," 18 U.S.C. § 2252(a), also applied to the phrase "involves the use of a minor" because "the age of the performers is the crucial element separating legal innocence from wrongful conduct." 513 U.S. at 73. Similarly, in *Rehaif*, the Court held that the word "knowingly" in the phrase whoever "knowingly violates" § 922(g), which prohibits persons with certain statuses from possessing firearms, applied to the status element in § 922(g) because this reading "helps advance the purpose of scienter, for it helps to separate wrongful from innocent acts." 139 S. Ct. at 2196–97. The Court reasoned that "the possession of a gun can be entirely innocent," and

---

[17] Because *Staples* has little relevance to the "how far" question raised in our case, the dissent's reliance on *Staples*, Dissent at 56, 63, is mistaken.

only the defendant's status distinguished an innocent act from a wrongful one under the statute. *Id.* at 2197.

By contrast, absent statutory language suggesting otherwise, the scienter presumption does not apply to elements that do not separate innocent from wrongful conduct. *See id.* at 2196 (holding that because "jurisdictional elements normally have nothing to do with the wrongfulness of the defendant's conduct, such elements are not subject to the presumption in favor of scienter"). Thus, the Court declined to apply this presumption in *Dean* because a defendant found guilty of violating 18 U.S.C. § 924(c) "is already guilty of unlawful conduct twice over: a violent or drug trafficking offense and the use, carrying, or possession of a firearm in the course of that offense," and the finding that the firearm is discharged (which is required under § 924(c)(1)(A)(iii) in order to impose a ten-year sentence) merely enhances the consequences for such unlawful acts. 556 U.S. at 576; *see also United States v. Crowder*, 656 F.3d 870, 875 (9th Cir. 2011) (holding that the word "knowingly" in the Sex Offender Registration and Notification Act (SORNA), 18 U.S.C. § 2250(a)—which imposes criminal penalties on any person who "knowingly fails to register or update a registration as required by [SORNA]"—does not apply to the phrase "as required by [SORNA]" because a defendant would know failing to register was "not an innocent act").

When the statutory language is ambiguous, the Court determines the meaning of the statutory text using other tools of statutory construction, including the rule of lenity, the canon of constitutional avoidance, and consistency with legislative history. Thus, in *X-Citement Video*, the Court noted that eliminating a scienter requirement as to the age of

the performers in a video involving sexual conduct "would raise serious constitutional doubts" given that "nonobscene, sexually explicit materials involving persons over the age of 17 are protected by the First Amendment," and it was "incumbent upon [the Court] to read the statute to eliminate those doubts so long as such a reading is not plainly contrary to the intent of Congress." 513 U.S. at 72, 78. In cases of "grievous ambiguity or uncertainty in the statute," *Dean*, 556 U.S. at 577 (quoting *Muscarello v. United States*, 524 U.S. 125, 138–39 (1998)), the Court has also applied the "longstanding recognition of the principle that ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity," *Liparota*, 471 U.S. at 427 (citation omitted). Finally, the Court has considered legislative history but has generally given it little weight. *See, e.g.*, *Liparota*, 471 U.S. at 430 n.13 (rejecting the government's argument that the legislative history supports its position); *Rehaif*, 139 S. Ct. at 2199 (rejecting the government's legislative history argument given that the history was "at best inconclusive").

3

We now apply these principles to § 841 to determine whether the phrase "knowingly" in § 841(a) applies to the drug type and quantity set forth in § 841(b)(1).

Section 841(a)(1) makes it unlawful for "any person knowingly or intentionally" to distribute "a controlled substance," which is an "unspecified substance listed on the federal drug schedules." *McFadden*, 576 U.S. at 192. Section 841(b)(1)(A)–(B) provide for the penalties to be imposed in the case of a § 841(a)(1) violation "involving"

certain types and quantities of drugs. Unlike § 841(a), § 841(b)(1) is silent as to any mens rea requirement.

"As a matter of ordinary English grammar," it is natural to read the intent requirement of "knowingly or intentionally" as modifying only the elements contained in the statutory phrase defining the § 841(a)(1) offense, i.e., "distribute" and "a controlled substance." *See Flores-Figueroa*, 556 U.S. at 650. Section 841(b) is not the object of the verbs in § 841(a)(1). *Compare* 21 U.S.C. § 841, *with Rehaif*, 139 S. Ct. at 2195 (relying on the fact that, in § 924(a)(2), the adverb "knowingly" modifies the verb "violates" and its direct object, § 922(g)). There is no natural or ordinary way to read the intent requirement in § 841(a)(1) as modifying the drug types and quantities in § 841(b).

While we begin by considering the natural reading of the language, *see Flores-Figueroa*, 556 U.S. at 650, we do not end there. We next turn to the structure and context of the statute. *See Dean*, 556 U.S. at 572. As in *Dean*, the structure of § 841(b) suggests that § 841(b)(1)(A)(viii) and § 841(b)(1)(B)(i) do not require proof that the defendant knew about the drug type and quantity. In § 841(b)(6), another provision in the same statute, Congress expressly provided that those who violate § 841(a) and "*knowingly or intentionally* use a poison . . . on Federal land," thus causing specified harms, are subject to certain penalties.[18] 21 U.S.C.

---

[18] 21 U.S.C. § 841(b)(6) provides:

Any person who violates subsection (a), or attempts to do so, and knowingly or intentionally uses a poison, chemical, or other hazardous substance on Federal land, and, by such use—

§ 841(b)(6) (emphasis added). This language shows that Congress knew how to require proof of mens rea with respect to the predicate facts for sentences under § 841(b), and chose not to do so in § 841(b)(1)(A)–(B). "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Dean*, 556 U.S. at 573 (alteration adopted and quotation omitted). Moreover, if we were to interpret the intent requirement in § 841(a) as modifying the numerous sentencing facts included under § 841(b), the intent requirement in § 841(b)(6) would be surplusage. The "canon against surplusage is strongest" where, as here, "an interpretation would render superfluous another part of the same statutory scheme." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013).

Because this redundancy fatally undermines the dissent's position, the dissent attempts to distinguish § 841(b)(6) from § 841(b)(1). According to the dissent, while the mens rea requirement in § 841(a) travels to the various subsections of § 841(b)(1), it does not travel to § 841(b)(6) because this subsection specifies a "separate criminal act" of "us[ing] a

---

(A) creates a serious hazard to humans, wildlife, or domestic animals,

(B) degrades or harms the environment or natural resources, or

(C) pollutes an aquifer, spring, stream, river, or body of water,

shall be fined in accordance with Title 18 or imprisoned not more than five years, or both.

poison, chemical, or other hazardous substance on Federal land." Dissent at 64–65. And because the traveling mens rea requirement in § 841(a) cannot reach this "separate criminal act," the dissent contends, Congress had to add an additional mens rea requirement to § 841(b)(6). *Id*.

This argument has no support in grammar or caselaw. The structure of § 841(b)(1) and § 841(b)(6) is similar; both apply to "any person who violates subsection (a)," and list certain predicate facts that subject such person to specified penalties.[19]  As we have explained, there is no natural or grammatical way to read the mens rea in § 841(a)(1) as applying to the predicate facts in § 841(b)(1).   Not surprisingly, it is equally unnatural and ungrammatical to read the mens rea in § 841(a)(1) to apply to the predicate facts in § 841(b)(6). The dissent fails to explain why it is *more* unnatural and ungrammatical to apply § 841(a)'s mens rea requirement to § 841(b)(6) than to § 841(b)(1), such that the mens rea travels to § 841(b)(1) but not § 841(b)(6). Nor has the dissent explained why it makes a difference that the conduct described in § 841(b)(6) (poisoning federal lands) could constitute a separate criminal act prosecutable under some other statute. Neither the Supreme Court nor we have endorsed any background principle that mens rea requirements are less likely to travel to predicate facts that can be prosecuted separately under other federal laws.

---

[19] The predicate facts in § 841(b)(6) are not distinguishable from the predicate facts in § 841(b)(1) in any relevant way. Both subsections provide the predicate facts for sentencing purposes. When Congress wanted to establish independently prosecutable offenses in § 841, it added additional sections, such as § 841(g) (criminalizing internet sales of date rape drugs) and § 841(h) (criminalizing dispensing of controlled substances by means of the internet).

The presumption that Congress did not want to "criminalize a broad range of apparently innocent conduct," *X-Citement Video*, 513 U.S. at 71 (cleaned up), and the importance of scienter "in separating wrongful from innocent acts," *Rehaif*, 139 S. Ct. at 2196, do not undercut our reading of the statutory text here.[20]   Knowingly distributing a controlled substance in violation of § 841(a)(1) is not an "entirely innocent" act.   *Rehaif*, 139 S. Ct. at 2197. Regardless of the type and quantity of the controlled substance, there is no risk that a defendant would fail to understand the unlawful nature of the act.   Our precedent is in accord; we have long recognized the basic rule that a defendant charged with a controlled substance offense "need not know the exact nature of the substance with which he was dealing," but "can be convicted under § 841 . . . if he believes he has *some* controlled substance in his possession." *United States v. Ramirez-Ramirez*, 875 F.2d 772, 774 (9th Cir. 1989) (quotation omitted) (collecting cases).

Nor does the structure of § 841(a) and (b), providing different penalties for different drug types and quantities, raise an inference that some scienter is necessary. *See Dean*, 556 U.S. at 573.   Where a criminal statute does not provide a scienter requirement, the Court has held the imposition of harsh penalties on defendants who were unaware they were violating the law supports the inference that Congress did not intend to create a strict liability public welfare offense.

---

[20] Contrary to the dissent's suggestion, Dissent at 65–66, Judge (now Justice) Kavanaugh, in dissenting in *United States v. Burwell*, chose not to address the question of "how the presumption [of mens rea] applies to a fact that Congress made a sentencing factor but that must be treated as an element of the offense for Fifth and Sixth Amendment purposes." 690 F.3d 500, 540 n.13 (D.C. Cir. 2012) (en banc) (Kavanaugh, J., dissenting).

*Staples*, 511 U.S. at 618.  Such a concern is not implicated in § 841, under which the defendant must be found guilty of knowingly or intentionally distributing controlled substances. Once a defendant knowingly or intentionally violates federal law, "it is not unusual to punish individuals for the unintended consequences of their *unlawful* acts."  *Dean*, 556 U.S. at 575 (emphasis in original).  The severity of a penalty need not be "precisely calibrated to the level of mens rea."  *Burwell*, 690 F.3d at 510 (citing *Dean*, 556 U.S. at 575).

Because the statutory language is not ambiguous, the other tools of statutory construction are unnecessary here.  In any event, they do not conflict with our conclusion.  First, defendants claim that the rule of lenity supports imposing mens rea requirements for the drug types and quantities in § 841(b).  We disagree.  The rule of lenity "applies only when, after consulting traditional canons of statutory construction, we are left with an ambiguous statute."  *Shular v. United States*, 140 S. Ct. 779, 787 (2020) (quotation omitted).  "To invoke the rule, we must conclude that there is a grievous ambiguity or uncertainty in the statute."  *Dean*, 556 U.S. at 577 (citing *Muscarello*, 524 U.S. at 138–39). Given the statutory text and structure of § 841(b), it is clear the provision does not contain an intent requirement and the defendants' "contrary arguments are not enough to render the statute grievously ambiguous."  *Id.*

Nor does the canon of constitutional avoidance require us to interpret § 841 as imposing a mens rea requirement for the drug type and quantity in order to avoid conflicting with the Due Process Clause and the Sixth Amendment.  Congress's decision not to impose a mens rea requirement is consistent with the Due Process Clause.  That "the government must

prove that the defendant knew he was importing some amount of a controlled substance . . . is sufficient to ensure the statute penalizes only culpable conduct." *United States v. Jefferson*, 791 F.3d 1013, 1018 (9th Cir. 2015). Similarly, the Sixth Amendment is not implicated, because the government is required to prove drug type and quantity to the jury beyond a reasonable doubt. *See Buckland*, 289 F.3d at 568. *Apprendi* and *Alleyne* do not affect the question whether the word "knowingly" applies to the drug types and quantities set out in § 841(b). The dissent's argument to the contrary, Dissent at 55, "confuses the requisite burden of proof with the mens rea standard." *Jefferson,* 791 F.3d at 1017 (citing *Dado*, 759 F.3d at 570). We comply with the constitutional mandate announced in *Apprendi* and *Alleyne* by requiring drug type and quantity under § 841(b) to be found by a jury beyond a reasonable doubt. *See Buckland*, 289 F.3d at 568.

Nor is recourse to legislative history necessary here. Where there is settled precedent on the interpretation of a statute, "we presume that when Congress reenacted the same language" in subsequent acts, "it adopted the earlier judicial construction of that phrase." *Helsinn Healthcare S.A. v. Teva Pharm. USA, Inc.*, 139 S. Ct. 628, 633–34 (2019). The judicial consensus that the government need not prove that the defendant "knowingly or intentionally" distributed a particular drug type and quantity has long been settled, *see infra* at 37–38 & n.21, and was not affected by the decisions in *Apprendi* or *Alleyne*. Indeed, Congress has amended § 841 six times since *Apprendi* was decided (once since *Alleyne*), without altering the statutory framework. *Cf. Rehaif*, 139 S. Ct. at 2199 (there had been "no definitive judicial consensus" as to whether a defendant's knowledge of his status was required under § 922(g), and Congress responded to the open question by amending the statute to include such an intent

requirement). Accordingly, the structure of § 841(a)–(b) compels the conclusion that Congress did not intend to require the government to prove a defendant's knowledge with respect to the drug type or quantity.

Our analysis is consistent with our prior opinions, which concluded that no intent requirement applies to drug types and quantities under § 841. *See United States v. Soto-Zuniga*, 837 F.3d 992, 1005 (9th Cir. 2016); *see also Jefferson*, 791 F.3d at 1015. In *Jefferson*, on which *Soto-Zuniga* relied, we interpreted 21 U.S.C. § 960(a) and (b), which are substantially identical to § 841(a) and (b), and concluded that the government did not have "to prove that the defendant knew the type or quantity of the controlled substance he imported to obtain a conviction under § 960(a), or for the penalties under § 960(b) to apply." 791 F.3d at 1015 (citations omitted). We subsequently confirmed that this interpretation applies to § 841(a) and (b). *See Soto-Zuniga*, 837 F.3d at 1005. In reaching this conclusion, we joined every other circuit to consider this issue; all have held that § 841(b)(1) does not require a finding of a defendant's mens rea with respect to the drug type and quantity.[21]

---

[21] *United States v. Collazo-Aponte*, 281 F.3d 320, 326 (1st Cir. 2002); *United States v. Andino*, 627 F.3d 41, 45–47 (2d Cir. 2010); *United States v. Barbosa*, 271 F.3d 438, 458 (3d Cir. 2001); *United States v. Brower*, 336 F.3d 274, 277 (4th Cir. 2003); *United States v. Betancourt*, 586 F.3d 303, 308–09 (5th Cir. 2009); *Dado*, 759 F.3d at 569–70; *United States v. Carrera*, 259 F.3d 818, 830 (7th Cir. 2001); *United States v. Ramos*, 814 F.3d 910, 915–17 (8th Cir. 2016); *United States v. De La Torre*, 599 F.3d 1198, 1204 (10th Cir. 2010); *United States v. Sanders*, 668 F.3d 1298, 1310 (11th Cir. 2012); *United States v. Branham*, 515 F.3d 1268, 1275–76 (D.C. Cir. 2008).

In sum, we conclude that in order to obtain a particular sentence under § 841(b)(1)(A)(viii) and § 841(b)(1)(B)(i) for a violation of § 841(a), the government must prove beyond a reasonable doubt the specific type and the quantity of substance involved in the offense, but not the defendant's knowledge of (or intent) with respect to that type and quantity.

## III

We have established in Section II.A, *supra*, that to convict the defendants of conspiracy under § 846 in this case, the government must prove beyond a reasonable doubt that each defendant agreed with another person that some member of the conspiracy would commit a § 841(a) offense, and that each defendant had the requisite intent necessary for a § 841(a) conviction. We have also established in Section II.B, *supra*, that the requisite intent necessary for a § 841(a) conviction (and for the imposition of the penalties specified in § 841(b)(1)(A)–(B)) does not include knowledge of the relevant drug type or quantity.   This concludes our explication of the elements of a § 846 conspiracy to commit a violation of § 841(a), and the imposition of penalties under § 841(b)(1).  We now turn to defendants' further arguments, and clarify that a conviction under § 846 does not require proof of a level of criminal intent greater than that required for the underlying offense merely because it is a conspiracy conviction.

## A

The Supreme Court addressed the question whether a conspiracy conviction required a heightened mens rea in *Feola*.  In that case, a defendant had been charged with

conspiracy (under the general federal conspiracy statute, 18 U.S.C. § 371) to assault a federal official in violation of 18 U.S.C. § 111(a)(1). *See Feola*, 420 U.S. at 672–73. The Court first determined that the underlying substantive offense did not require proof that the defendant intended "to assault a federal officer," rather, the government had to prove only that the defendant intended to assault someone. *Id.* at 684. The Court then considered "whether the rule should be different where persons conspire to commit" such an assault, *id*. at 686, and concluded that it should not, *see id.* at 686–96. In so holding, the Court stated the general rule "that where knowledge of the facts giving rise to federal jurisdiction is not necessary for conviction of a substantive offense embodying a mens rea requirement, such knowledge is equally irrelevant to questions of responsibility for conspiracy to commit that offense." *Id.* at 696.

In reaching this conclusion, *Feola* first considered whether the text of the conspiracy statute required proof of a greater intent than the intent required for the underlying offense. It concluded that § 371 (the conspiracy statute at issue) "offers no textual support for the proposition that" a defendant who agreed to assault an individual must have knowledge as to the employment status of the victim. *Id.* at 687.

Second, *Feola* concluded that "it is clear that one may be guilty as a conspirator for acts the precise details of which one does not know at the time of the agreement." *Id.* at 692; *see also id.* at 694 (explaining the common law principle that "conspiracy is an inchoate crime," which means that the agreement is, by definition, undeveloped). *Feola* therefore rejected the defendant's argument "that it is improper to find conspiratorial liability where the parties to the illicit

agreement were not aware of" all the elements of the underlying offense "because the essence of conspiracy is agreement and persons cannot be punished for acts beyond the scope of their agreement." 420 U.S. at 692.

Third, *Feola* established the general principle that where an element of the underlying substantive offense does not include an intent requirement, the same will be true for a conspiracy to commit that offense, "unless one of the policies behind the imposition of conspiratorial liability is not served" by having the same intent. *Id*. at 693. According to the Court, the "two independent values served by the law of conspiracy" are: (1) "protection of society from the dangers of concerted criminal activity;" and (2) "intervention of the criminal law" at a "point in the continuum between preparation and consummation" of a criminal act when "the likelihood of a commission of an act is sufficiently great and the criminal intent sufficiently well formed." *Id.* at 693–94. When applying this principle, the central question is whether the act of agreeing with another person that some member of the conspiracy will commit a crime is as blameworthy and dangerous to society as the act of the lone criminal who actually commits that same crime. If the agreement and the commission are equally opprobrious, the conspirator and the person who commits the act should be held to the same standard, at least with respect to intent. *See id.* In the federal assault statute at issue in *Feola*, knowledge of the victim's identity was not necessary for conviction of the substantive offense, and thus was "equally irrelevant to questions of responsibility for conspiracy to commit that offense." *Id.* at 696. Therefore, "its imposition . . . would serve only to make it more difficult to obtain convictions on charges of conspiracy, a policy with no apparent purpose." *Id.* at 694.

Although *Feola* stated its specific holding in terms of "facts giving rise to federal jurisdiction," *id*. at 696, its framework for determining whether the intent requirement for a conspiracy count is "greater than" the intent required for the underlying substantive offense, *id.* at 686, is generally applicable.    First, *Feola* did not limit its analysis to jurisdictional facts it deemed extraneous to "the offense Congress intended to describe and to punish." *Id*. at 676 n.9. To the contrary, *Feola* stated that labeling a requirement as "jurisdictional" does not mean the requirement "is viewed as outside the scope of the evil Congress intended to forestall." *Id.*  In the case before it, *Feola* deemed the status of the victim as a federal agent to be a significant component of the assault offense under § 111 because Congress sought "to protect the integrity of federal functions and the safety of federal officers." *Id.*  Given that the element of the assault offense regarding the victim's status is not merely jurisdictional, *Feola*'s analysis readily applies to other elements of an offense.

Second, we have previously reached the conclusion that "the rule of *Feola*" is a general one that requires "the same degree of intent for the conspiracy charge as is required by the underlying statute." *United States v. Thomas*, 887 F.2d 1341, 1347 (9th Cir. 1989); *see United States v. Hubbard*, 96 F.3d 1223, 1229 (9th Cir. 1996) (citing *Feola*, 420 U.S. at 696) (holding that "a federal conspiracy conviction does not require a greater level of criminal intent than a conviction on the substantive count").  We have applied this general rule to contexts involving facts that were not jurisdictional.  For instance, we held that when a person was charged with conspiracy to receive stolen explosives, the government did not have to prove the person *knew* the dynamite was stolen, but only that the person had "reasonable cause to believe"

that fact, which was the same degree of scienter required by the underlying offense. *United States v. Karr*, 742 F.2d 493, 497 (9th Cir. 1984); *see also Thomas*, 887 F.2d at 1347 (explaining the ruling in *Karr*). Similarly, in *United States v. Baker*, we held that if a conviction of a violation of a federal statute does not require proof of an intent to violate that law, "neither does a conviction for conspiring to engage in activities which violate" that law. 63 F.3d 1478, 1493 (9th Cir. 1995).[22]

## B

We apply *Feola*'s general rule here. Adhering to *Feola*'s analytical framework, we first start by examining the plain language of the conspiracy statute, 21 U.S.C. § 846. Like the general conspiracy statute, § 846 "offers no textual support" for the proposition that a defendant must possess a degree of intent as to the type and quantity of drug involved in the underlying offense.[23]   Rather, § 846's requirement that a

---

[22] The Eleventh Circuit has likewise applied *Feola* outside the context of jurisdictional facts. *See, e.g.*, *United States v. Whyte*, 928 F.3d 1317, 1332 (11th Cir. 2019) (relying on *Feola* for the proposition that where the "offense of sex trafficking of a minor does not require knowledge of the victim's status as a minor," then the conspirator "cannot import such a requirement into her conspiracy offense."); *see also United States v. Duran*, 596 F.3d 1283, 1296 (11th Cir. 2010) (holding that where a defendant has been charged with conspiracy to act as an agent of a foreign government without providing the required notification, the government does not have to prove the defendant knew of the notification requirement when the underlying substantive offense does not require proof of such knowledge).

[23] *Compare* 18 U.S.C. § 371 ("If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one

conspirator "shall be subject to the same penalties as those prescribed for the [underlying] offense" indicates that the penalties for a § 846 offense must be "the same" as the penalties for the underlying offense, which also suggests that the facts triggering those penalties must be "the same." This undercuts the argument that Congress intended to require the government to prove a different (and heightened) mens rea in the conspiracy context.

Second, because "it is clear that one may be guilty as a conspirator for acts the precise details of which one does not know at the time of the agreement," *Feola*, 420 U.S. at 692, the fact that a defendant (who has been convicted of conspiracy under § 846 for an agreement to violate § 841(a)) may not have known about certain details regarding drug type and quantity does not preclude subjecting that defendant to a statutory penalty based on those unknown details. Therefore, we reject the defendants' argument that conspirators who agree to distribute controlled substances cannot be punished unless they knew the specific drug type and amount to be distributed.

Defendants argue that the Supreme Court revived this argument in *Ocasio* by referencing the "long-recognized principle[] of conspiracy law" that "the fundamental characteristic of a conspiracy is a joint commitment to an 'endeavor which, if completed, would satisfy all of the

---

or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both."), *with* 21 U.S.C. § 846 ("Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.").

elements of the underlying substantive criminal offense.'" 136 S. Ct. at 1429 (alteration adopted) (quoting *Salinas*, 522 U.S. at 65). We disagree. *Ocasio* did not consider the specific question raised in *Feola*, let alone overrule *Feola*'s general rule. In fact, *Ocasio* never cited *Feola*. Because *Ocasio* merely recites a general common law principle without discussing how it applies in the context of determining a conspirator's intent, we are bound by *Feola*'s specific direction.[24]

Last, as indicated in *Feola*, we consider whether requiring the same mens rea for a § 846 conspiracy as for the underlying offense would fail to serve the values of protecting society from "the dangers of concerted criminal activity" or intervening in a criminal agreement before the criminal act took place. *Feola*, 420 U.S. at 693. As the Court held in *Feola*, we conclude that the offense of conspiracy to distribute a controlled substance is as "opprobrious" and dangerous to society as the act of the individual drug dealer who actually distributes the controlled substance. *Id.* Because the acts are equally blameworthy, and the person who commits the underlying act need not know drug type and

---

[24] For the same reason, we reject the views of the Fifth Circuit in *United States v. Anderson*, 932 F.3d 344, 352 (5th Cir. 2019). In *Anderson*, the Fifth Circuit held that where a person has been charged with conspiracy to receive money obtained from extortion, the government must prove that the conspirator knew the money was the proceeds of extortion, even though the underlying substantive offense does not require proof of such knowledge. *Id.* Citing *Ocasio*, the Fifth Circuit reasoned that the "mens rea for conspiracy is distinct and more demanding" than for the underlying substantive count because the government must prove that the defendant agreed that some member of the conspiracy would commit every element of the offense. *Id.* The Fifth Circuit stands alone with this approach. Because it fails to mention, let alone distinguish, *Feola*, which rejected a similar argument, we decline to follow it.

quantity, that knowledge "is equally irrelevant to questions of responsibility for conspiracy to commit that offense." *Id.* at 696. Moreover, as was the case in *Feola*, the imposition of an additional burden on the government to prove the conspirator's knowledge of drug type and quantity "would serve only to make it more difficult to obtain convictions on charges of conspiracy, a policy with no apparent purpose." *Id.* at 694.

Accordingly, we conclude that to obtain a conviction and a particular sentence for conspiracy to distribute controlled substances under § 846, the government must prove only that the defendant's mental state was the same as if the defendant had been charged with the underlying offense. Applying that principle here, the government need not prove the defendant's knowledge of the drug type and quantity under § 841(b).

IV

While our conclusion is grounded in the text of the statute and principles of conspiracy law, it is markedly different from how we have previously characterized the framework for determining drug type and quantity when a defendant is charged under § 846 or § 841.[25] We briefly explain why our prior approach, which heavily relied on the formulation in the Guidelines, was mistaken.

The Guidelines provides detailed advisory guidance to federal judges in determining the sentencing range for a convicted defendant. "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for all sentencing.

---

[25] This was the crux of the dispute between the parties.

*Gall v. United States*, 552 U.S. 38, 49 (2007). But we do not defer to the Guidelines when interpreting criminal statutes. *See United States v. Morales*, 590 F.3d 1049, 1052 (9th Cir. 2010) ("Of course, the [Sentencing] Commission can't tell federal courts how to interpret statutes."). Therefore, while the relevant sections of the Guidelines guide a court's post-conviction sentencing determinations, we may not rely on them when determining what is required for a conviction and statutory sentence.

Under the Guidelines, after a defendant has been convicted for violating § 846 or § 841, a district court must refer to Chapter Two, Part D of the Guidelines, "Offenses involving Drugs." *See* U.S.S.G. § 2D (2018). For a drug trafficking offense, including conspiracy to commit such an offense, the Guidelines specifies more than one base offense level (depending on drug type and quantity, among other things) and identifies several specific offense characteristics that can affect the offense level.[26] *See* U.S.S.G. § 2D1.1 (2018). To determine the appropriate offense level for any given defendant, the Guidelines directs courts to consider certain "relevant conduct." *See* U.S.S.G. §§ 1B1.2(b) & 1B1.3 (2018). The Guidelines defines the term "relevant conduct" to mean:

> in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as

---

[26] For example, an offense level is increased by two levels when "the object of the offense was the distribution of a controlled substance in a prison, correctional facility, or detention facility." U.S.S.G.§ 2D1.1(b)(4) (2018).

a conspiracy), all acts and omissions of others that were—

> (i) within the scope of the jointly undertaken criminal activity,
>
> (ii) in furtherance of that criminal activity, and
>
> (iii) reasonably foreseeable in connection with that criminal activity;

that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.

U.S.S.G. § 1B1.3(a)(1)(B) (2018).[27] Although § 1B1.3(a) limits a defendant's accountability for sentencing purposes, the application notes to § 1B1.3 acknowledge that the Guidelines does not purport to establish standards of criminal liability. *See* U.S.S.G. § 1B1.3, cmt. n.1 (2018).

---

[27] The meaning of the term "relevant conduct" in the context of a jointly undertaken criminal activity has changed over the years. For example, in 1991, the term "relevant conduct" included "all acts and omissions . . . for which the defendant would be otherwise accountable," U.S.S.G. § 1B1.3(a)(1) (1991), and the application notes explained that the "[c]onduct for which the defendant 'would be otherwise accountable' . . . includes conduct of others in furtherance of the execution of the jointly-undertaken criminal activity that was reasonably foreseeable by the defendant," U.S.S.G. § 1B1.3, cmt. n.1 (1991). The Guidelines did not include the "within the scope" requirement until 2015. *See* U.S.S.G. § 1B1.3(a)(1)(B) (2015).

Under the "relevant conduct" standard, a defendant's offense level is determined based on the conduct of coconspirators only if the conduct falls "within the scope of the jointly undertaken criminal activity," is committed "in furtherance of that criminal activity," and is "reasonably foreseeable in connection with that criminal activity."[28] U.S.S.G. § 1B1.3, cmt. n.3(A) (2018). The Guidelines apparently borrowed this standard from *Pinkerton*, which limits a defendant's liability for substantive offenses committed by coconspirators to include only those acts that were "done in furtherance of the conspiracy," fell "within the scope of the unlawful project," and were "part of the ramifications of the plan" which could be "reasonably foreseen as a necessary or natural consequence of the unlawful agreement." *Pinkerton*, 328 U.S. at 647–48. But *Pinkerton* clearly distinguishes between conspiracy and a substantive offense, *see* 328 U.S. at 643, while the Guidelines does not. Rather, the Guidelines adopts *Pinkerton*'s rule of coconspirator liability and applies it "in the case of a jointly undertaken criminal activity . . . whether or not charged as a conspiracy." U.S.S.G. § 1B1.3(a)(1)(B) (2018); *see also* U.S.S.G. § 1B1.3, cmt. n.1 (1991) (same).

Perhaps due to the fact that Congress originally made the Guidelines "mandatory and binding on all judges," *United States v. Booker*, 543 U.S. 220, 233 (2005), we failed to make a distinction between the Guidelines and the sentencing factors set forth in § 841(b). The misstep dates back to *United States v. Becerra*, which involved a challenge to the district court's imposition of 20-year sentences on two

---

[28] Such a sentencing determination must be supported by a preponderance of the evidence. *See United States v. Perez*, 962 F.3d 420, 448 (9th Cir. 2020).

defendants who had been part of a conspiracy to sell narcotics. *See* 992 F.2d 960, 966 (9th Cir. 1993). The defendants argued that the sentence was erroneous because the transaction, which had involved 25 kilograms of cocaine, was neither reasonably foreseeable nor within the scope of the conspiracy. *Id.* Relying on the 1991 version of the Guidelines, which provided that "each conspirator may be sentenced only for the quantity of drugs that he reasonably foresaw would be distributed or that fell within the scope of his own agreement with his co-conspirators," *Becerra* upheld one defendant's sentence and reversed the other's. *Id.* at 966–67. *Becerra* noted, in a footnote, that this mandatory standard would apply with equal force to 21 U.S.C. § 841(b). *See id.* at 967 n.2 ("We see no reason why sentencing under the statutory mandatory minimums should differ [from sentencing under the Guidelines, because the statutory minimums] are, in essence, part of the Guidelines scheme."). Following *Becerra*, we interpreted § 841 as if it directly incorporated the standard adopted by the Guidelines. *See United States v. Banuelos*, 322 F.3d 700, 704 (9th Cir. 2003). *Banuelos* held that in order to subject a conspirator to a mandatory minimum or statutory maximum sentence under § 841(b), the type and quantity of the substance involved in the conspiracy must either have fallen "within the scope of the defendant's agreement with his coconspirators" or have been "reasonably foreseeable to the defendant." *Id.*

Our error in *Becerra* and *Banuelos* was the failure to recognize that the rule of coconspirator liability for substantive offenses in *Pinkerton*, which was incorporated into the Guidelines and applied regardless of whether the charge was conspiracy or a substantive offense, does not apply to the liability determination for a § 846 conspiracy offense. As a result of this error, our cases mistakenly

focused on the question whether we should adjust our interpretation of § 846 and § 841(b) in accordance with the Guidelines' shifting formulation, rather than whether that formulation is applicable at all.  *See United States v. Torres*, 869 F.3d 1089, 1095–1100 (9th Cir. 2017) (Ikuta, J., specially concurring).

We now overrule *Becerra* and its progeny to the extent they depart from our decision today.  Because *Pinkerton* addresses when a defendant can be liable for substantive offenses committed by coconspirators, it is irrelevant to a defendant's liability for conspiracy.  To the extent § 1B1.3 or other applicable Guidelines provisions incorporate *Pinkerton*, they cannot guide our statutory analysis when the defendants are charged only with conspiracy.

In reaching this conclusion, we join the well reasoned opinion of the Sixth Circuit, which is grounded in the text of the statute.  *See United States v. Robinson*, 547 F.3d 632 (6th Cir. 2008).  We note our departure from the other circuits, which have largely made errors that echo our own.[29]  Some circuits rely on *Pinkerton* without acknowledging the

---

[29] *See United States v. Pizarro*, 772 F.3d 284 (1st Cir. 2014); *United States v. Martinez*, 987 F.2d 920 (2d Cir. 1993); *United States v. Phillips*, 349 F.3d 138 (3d Cir. 2003), *vacated on other grounds*, *Barbour v. United States*, 543 U.S. 1102 (2005); *United States v. Collins*, 415 F.3d 304 (4th Cir. 2005); *United States v. Haines*, 803 F.3d 713 (5th Cir. 2015); *United States v. Seymour*, 519 F.3d 700 (7th Cir. 2008); *United States v. Littrell*, 439 F.3d 875 (8th Cir. 2006); *United States v. Ellis*, 868 F.3d 1155 (10th Cir. 2017); *United States v. Stoddard*, 892 F.3d 1203 (D.C. Cir. 2018).

difference between conspiracy and the substantive offense.[30] *See, e.g.*, *Stoddard*, 892 F.3d at 1221. Other circuits rely on the Guidelines. *See, e.g.*, *Haines*, 803 F.3d at 740; *United States v. Irvin*, 2 F.3d 72, 77 (4th Cir. 1993). And it appears that two circuits have adopted one approach for mandatory minimum sentences and a different approach for statutory maximum sentences. *See Pizarro*, 772 F.3d at 292–93; *Haines*, 803 F.3d at 741–42. For the reasons explained above, we are not persuaded by the reasoning of those circuits that have relied on *Pinkerton*, the Guidelines, or both.

Even though the Guidelines does not impact our interpretation of the statute, the Guidelines works with the statute to ensure that a defendant is not exposed to unlimited liability. Once a defendant is convicted and the statutory sentencing range is established by the jury's factual findings, the district court must follow the Guidelines, which will establish a fair sentence based on an individualized assessment of accountability. "Under the Guidelines each conspirator, for sentencing purposes, is to be judged not on the distribution made by the entire conspiracy but on the basis of the quantity of drugs which he reasonably foresaw or which fell within 'the scope' of his particular agreement with the conspirators." *United States v. Petty*, 992 F.2d 887, 890 (9th Cir. 1993).

---

[30] The Fourth Circuit concedes that "[t]he principles outlined in *Pinkerton*" do not apply to conspiracy under § 846, but it nevertheless requires a jury to be instructed in *Pinkerton* principles when determining the substance type and quantity involved in a conspiracy. *Collins*, 415 F.3d at 313, 314.

V

We now apply our approach to the case on appeal. Each defendant was indicted for conspiracy under § 846 to distribute controlled substances in violation of § 841(a)(1).

At trial, the jury was instructed that if it found the defendant guilty of the conspiracy charge, it had to determine "whether the government proved beyond a reasonable doubt that the amount of [the specified drug] that was reasonably foreseeable to him or fell within the scope of his particular agreement equaled or exceeded" a specified amount. Although the district court was not at fault in attempting to rely on our confusing precedent, we now conclude that this instruction was erroneous. As we have explained, a defendant convicted of conspiracy under § 846 is subject to a penalty under § 841(b)(1)(A)–(B) if the government has proven beyond a reasonable doubt that the underlying § 841(a)(1) offense involved the drug type and quantity set forth in § 841(b)(1)(A)–(B). The government does not have to prove that the defendant had any knowledge or intent with respect to those facts.

A jury instruction misstating the law is subject to harmless error review. *United States v. Conti*, 804 F.3d 977, 980 (9th Cir. 2015). An erroneous jury instruction will be deemed harmless if the "reviewing court concludes beyond a reasonable doubt that the omitted [or misstated] element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error." *Neder v. United States*, 527 U.S. 1, 17 (1999). In this case, the erroneous jury instructions could amount to harmless error if there was overwhelming evidence that each

defendant entered into an agreement involving the requisite drug type and quantity.

To safeguard a criminal defendant's Sixth Amendment guarantee to a jury trial, the reviewing court must "conduct a thorough examination of the record." *Id.* at 19. Given the numerous issues raised on appeal and the extensive record from the ten-day jury trial, we find it appropriate to return this case to the three-judge panel to reconsider both the harmless error issue and the balance of the issues raised by the parties in light of this opinion, and to enter an appropriate judgment. *See, e.g.*, *Gonzalez Batoon v. INS*, 791 F.2d 681, 686 (9th Cir. 1986) (en banc).

**REMANDED to the three-judge panel.**

---

W. FLETCHER, Circuit Judge, with whom THOMAS, Chief Circuit Judge, and NGUYEN, WATFORD, and HURWITZ, Circuit Judges, join, dissenting:

Under 21 U.S.C. § 841(a)(1), it is illegal for a person "knowingly or intentionally" to "possess with intent to . . . distribute . . . a controlled substance." It has long been the law in this circuit that "a defendant who has knowledge that he possesses a controlled substance may have the state of mind necessary for conviction even if he does not know which controlled substance he possesses." *United States v. Jewell*, 532 F.2d 697, 698 (9th Cir. 1976) (en banc); *see also McFadden v. United States*, 576 U.S. 186, 192 (2015) ("The ordinary meaning of § 841(a) . . . requires a defendant to know only that the substance he is dealing with is some unspecified substance listed on the federal drug schedules.").

In general, if the offense involves a Schedule I or Schedule II controlled substance (absent aggravating circumstances not at issue here), the defendant may upon conviction receive a sentence of "not more than twenty years." 21 U.S.C. § 841(b)(1)(C). In such a case, there is no mandatory minimum sentence. *Id.*

For eight specified Schedule I and II controlled substances, however, §§ 841(b)(1)(A) and (b)(1)(B) provide for mandatory minimum sentences that differ depending on the particular substance and quantity. For example, if a defendant distributes 50 or more grams of methamphetamine, the mandatory minimum sentence is ten years and the permissible maximum sentence is life. *See id.* § 841(b)(1)(A)(viii). If a defendant distributes 100 or more grams of a substance containing a detectable amount of heroin, the mandatory minimum sentence is five years and the permissible maximum sentence is forty years. *See id.* § 841(b)(1)(B)(i). If death or bodily injury results from the distribution, the mandatory minimum sentence under both §§ 841(b)(1)(A) and (b)(1)(B) is twenty years.

The defendants in this case were charged with conspiring, in violation of 21 U.S.C. § 846, to distribute 50 grams or more of methamphetamine and 100 grams or more of a substance containing a detectable amount of heroin, in violation of §§ 841(a)(1), 841(b)(1)(A)(viii) and (b)(1)(B)(i). According to the majority, once the government proves beyond a reasonable doubt that a defendant knowingly or intentionally distributed a controlled substance, and that substance turns out to be one of the eight controlled substances in an amount specified by §§ 841(b)(1)(A) and (b)(1)(B), a mandatory minimum and enhanced maximum sentence automatically apply. The sentences for a violation

of § 841(a)(1) are thus dramatically and mandatorily increased in the absence of any *mens rea* as to drug type and amount. I respectfully disagree.

Any crime whose penalty is increased by law based on a specified fact is an "aggravated crime." *Alleyne v. United States*, 570 U.S. 90, 113 (2013). "Any fact that, by law, increases the penalty for a crime is an 'element'" of the crime. *Id.* at 103; *see also Apprendi v. New Jersey*, 530 U.S. 466 (2000). Any such fact must be submitted to the jury and proved beyond a reasonable doubt. *Alleyne*, 570 U.S. at 116. There is a strong presumption that Congress intends to require a culpable *mens rea* as to every element of a crime. *See, e.g.*, *Rehaif v. United States*, 139 S. Ct. 2191, 2195 (2019); *Flores-Figueroa v. United States*, 556 U.S. 646, 650 (2009). Applying that presumption, I would hold that when the government seeks enhanced penalties under §§ 841(b)(1)(A) or (b)(1)(B)—specifically, the mandatory minimums and increased statutory maximums that do not exist for Schedule I or II drug violations charged under § 841(b)(1)(C)—it must prove the defendant "knowingly or intentionally" distributed the actual controlled substance and quantity charged under §§ 841(b)(1)(A) or (b)(1)(B).

## I. Presumption of *Mens Rea*

"[T]he existence of a *mens rea* is the rule of, rather than the exception to, the principles of Anglo-American criminal jurisprudence." *United States v. United States Gypsum Co.*, 438 U.S. 422, 436 (1978) (internal quotation marks omitted). William Blackstone wrote that it is "absurd" to apply the same punishment to "crimes of different malignity." 4 William Blackstone, Commentaries on the Laws of England 17 (1769). In the leading nineteenth-century treatise, Joel

Prentiss Bishop wrote that punishment requires concurrence between *mens rea* and the wrong inflicted because "the evil intended is the measure of a man's desert of punishment." 1 Joel Prentiss Bishop, Commentaries on the Criminal Law § 334 (7th ed. 1882). Justice Robert Jackson wrote in *Morissette v. United States* that the relation between *mens rea* and punishment is "almost as instinctive as the child's familiar exculpatory 'But I didn't mean to.'" 342 U.S. 246, 251 (1952).

The presumption of *mens rea* reinforces other foundational principles of criminal law. First, a person's mistake of fact ordinarily mitigates guilt and resulting punishment. As Justice Jackson wrote, the law often recognizes "good faith or blameless intent as a defense, partial defense, or as an element to be considered in mitigation of punishment." *Id.* at 265. Second, a person should have fair notice as to the likely consequences of voluntary acts. The terms in a penal statute defining an offense "must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties." *Connally v. Gen. Const. Co.*, 269 U.S. 385, 391 (1926).

The Supreme Court has never insisted that Congress clearly state its intention to require *mens rea* as part of the definition of a crime. Indeed, in one case the Court relied on the presumption to conclude that a *mens rea* is required despite the complete absence of *mens rea* language anywhere in the statute. *See Staples v. United States*, 511 U.S. 600, 619 (1994). It necessarily follows that the presumption applies "with equal or greater force" when Congress includes an explicit *mens rea* provision. *Rehaif*, 139 S. Ct. at 2195. A severe criminal penalty makes the already strong presumption

even stronger, for the severity of the penalty is a "significant consideration" in determining whether Congress intended to require a *mens rea*.  *Staples*, 511 U.S. at 616; *see also United States v. X-Citement Video, Inc.*, 513 U.S. 64, 72 (1994) (pointing to the harsh penalty as a reason to apply the presumption).  The presumption is overridden only if Congress makes plain that it intends to forego a *mens rea* requirement.  *Rehaif*, 139 S. Ct. at 2195.

There are two exceptions to the presumption of *mens rea*, neither of which applies in the case before us.  First, there is an exception for "public welfare" offenses.  *See id.* at 2197. The public welfare exception applies only to statutes that provide for "light penalties such as fines or short jail sentences," *Staples*, 511 U.S. at 616, or where "conviction does no grave damage to an offender's reputation," *Morissette*, 246 U.S. at 342.  Second, *mens rea* is not required for a jurisdictional element of a crime, such as a requirement that a firearm traveled in interstate commerce, because such elements have no bearing on the wrongfulness of a defendant's conduct.  *Rehaif*, 139 S. Ct. at 2196.

There is a strong presumption that a *mens rea* requirement exists for all elements of a crime.  *See id.* at 2195 (citing Model Penal Code § 2.02(4), (Am. L. Inst. 1985) (when a statute prescribes a level of culpability, it applies to "all the material elements of the offense, unless a contrary purpose plainly appears")).  In two cases, the Supreme Court has explained what constitutes an "element."

In *Apprendi*, the Court held that a fact underlying a sentencing enhancement beyond the statutory maximum is an element of the crime, disagreeing with New Jersey's contention that a fact resulting in a higher sentence was a

mere "sentencing factor."  530 U.S. at 492.  Rather, the Court explained, the question of whether a fact is an element of the crime is "one not of form, but of effect."  *Id.* at 494.  Courts must ask whether the fact exposes the defendant to greater punishment.  *Id.*

In *Alleyne*, the Court applied *Apprendi* to a statute describing a "core crime" and prescribing escalating criminal penalties depending on particular facts specified in the statute.  *See* 570 U.S. at 111–16.  The core crime was using or carrying a firearm in relation to a crime of violence.  A defendant who committed the core crime, without more, was subject to a 5-year mandatory minimum.  A defendant who "brandishe[d]" the firearm in committing the core crime was subject to a 7-year mandatory minimum.  *See* 18 U.S.C. § 924(c)(1)(A)(i)–(ii).  The Court wrote that "facts increasing the legally prescribed floor *aggravate* the punishment" and "heighten[] the loss of liberty associated with the crime." *Alleyne*, 570 U.S. at 113 (emphasis in original).  "[T]he core crime and the fact triggering the mandatory minimum sentence together constitute a new, aggravated crime."  *Id.* According to the Court, "Any fact that, by law, increases the penalty for a crime is an 'element.'"  *Id.* at 103.  Any such fact must be submitted to the jury and proved beyond a reasonable doubt.  *Id.* at 116.

To give effect to the presumption of *mens rea*, the Court has been "reluctan[t] to simply follow the most grammatical reading of [a] statute."  *X-Citement Video*, 513 U.S. at 70.  *X-Citement Video* is a prime example of ignoring the niceties of grammar.  The statute at issue provided:

(a) Any person who—

(1) knowingly transports or ships using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means including by computer or mails, any visual depiction, if—

(A) the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and

(B) such visual depiction is of such conduct;

. . .

shall be punished as provided in subsection (b) of this section.

18 U.S.C. § 2252(a). The question was whether the *mens rea* of "knowingly" required that defendants not only knew that they were transporting or shipping a "visual depiction" of "sexually explicit conduct," but also required that they knew that the depiction "involve[d] the use of a minor engaging in [that] conduct." *Id.*

Our court had held in *X-Citement Video* that the *mens rea* requirement applied only to the act of transporting the depiction of sexually explicit conduct. *United States v. X-Citement Video, Inc.*, 982 F.2d 1285, 1289–90 (9th Cir. 1992). We had held that *mens rea* requirement did not

require knowledge that the depiction involved the use of a minor. *See id.* at 1292 (stating that applying *mens rea* to this element would be "judicial rewriting of [the] statute"). The Supreme Court reversed. In an opinion by Chief Justice Rehnquist, the Court held that the knowledge *mens rea* applied to both elements of the crime. The Court held that "knowingly" modified the phrase "involves the use of a minor," even though the key phrase was not the phrase directly modified by the adverb. *X-Citement Video*, 513 U.S. at 68–70.

Further, the Supreme Court has allowed a considerable distance between the words specifying the *mens rea* and the words describing the element of the crime. In *X-Citement Video*, the adverb "knowingly" was separated from "involves the use of a minor" by twenty-six words. In *Rehaif*, the word specifying the *mens rea* and the words specifying elements of the crime were in entirely different sections of Title 18. Section 924(a)(2) provided a penalty of up to 10 years' imprisonment for "knowingly" engaging in acts with several different factual predicates. The acts were identified in § 924(a)(2) only by cross-references to subsections in § 922. Among the factual predicates in § 922(g) were two relevant to the defendant: (1) that the defendant possessed a firearm, and (2) that the defendant was an alien unlawfully in the United States. The question was whether the government needed to prove that a defendant charged with violating § 924(a)(2) knew both that he possessed a firearm and that his status at the time of possession was as an alien unlawfully in the country. The Court held that Congress intended *mens rea* as to all material elements of the crime, even those in the separate section of the statute. *Rehaif*, 139 S. Ct. at 2196.

## II.  Aggravated Crimes under §§ 841(b)(1)(A) and 841(b)(1)(B)

Subsection 841(a)(1) criminalizes conduct with respect to a wide range of controlled substances and quantities, with a correspondingly wide range of penalties, as specified in § 841(b)(1).  Subsection 841(a)(1) provides that "it shall be unlawful for any person *knowingly or intentionally* to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute or dispense, a controlled substance." (Emphasis added.)  The general punishment for § 841(a)(1) violations involving Schedule I and II substances is up to twenty years in prison, with no mandatory minimum sentence.  21 U.S.C. § 841(b)(1)(C).

However, §§ 841(b)(1)(A) and (b)(1)(B), when combined with § 841(a)(1), describe "aggravated crimes" under *Alleyne*, 570 U.S. at 113. When a forbidden act with respect to one of eight specific Schedule I or II controlled substances is charged under §§ 841(b)(1)(A) or (b)(1)(B), mandatory minimum and higher maximum sentences apply.  Section 841(b)(1)(A) provides a "term of imprisonment" of "not . . . less than 10 years or more than life . . ." for eight controlled substances meeting or exceeding specified quantities. Subsection 841(b)(1)(B) provides for an imprisonment term of "not . . . less than 5 years and not more than 40 years . . ." for the same eight substances in lesser quantities.  If death or bodily injury results from the manufacture, distribution or dispensation, the mandatory minimum sentence under both §§ 841(b)(1)(A) and (b)(1)(B) is  increased to twenty years.

We are concerned in this case with two of the controlled substances and quantities listed in §§ 841(b)(1)(A) and (b)(1)(B).   Defendants were charged with conspiring to

distribute controlled substances and quantities listed in § 841(b)(1)(A)(viii) (methamphetamine, a Schedule II substance) and § 841(b)(1)(B)(i) (heroin, a Schedule I substance).

This should be an easy case. The structure of § 841 is clear and straightforward. Subsection 841(a)(1) prohibits certain knowing or intentional acts with respect to controlled substances. Subsections 841(b)(1)(A) and (b)(1)(B), immediately following, prescribe mandatory enhanced penalties for eight specified Schedule I and II controlled substances in specified quantities. Under § 841(b)(1)(C), unless death or serious bodily injury results, no mandatory minimum applies to violations of § 841(a)(1). But under § 841(b)(1)(A)(viii), a sentence of not less than 10 years and no more than life applies to an offense involving 50 grams or more of methamphetamine. Under § 841(b)(1)(B)(i), a sentence of not less than five years and no more than 40 years applies to an offense involving between 100 grams or more of a substance containing a detectable amount of heroin.

Under *Alleyne*, the specific controlled substance and its quantity are elements of the aggravated crimes created by the combination of § 841(a)(1) and §§ 841(b)(1)(A) and (b)(1)(B). Even without the presumption that *mens rea* applies to all elements of a crime, I would conclude that a plain reading of § 841 indicates that Congress intended to require the government to prove knowledge or intent with respect to the controlled substances and quantities specified in §§ 841(b)(1)(A) and (b)(1)(B). But the presumption applies, and it reinforces the conclusion I would reach independently. Indeed, the presumption applies with particular force, given the severity of the penalties.

Despite the explicit *mens rea* requirement in § 841(a)(1), despite the proximity of § 841(a)(1) to §§ 841(b)(1)(A) and (b)(1)(B), despite the fact that type and quantity of the controlled substances in §§ 841(b)(1)(A) and (b)(1)(B) are elements of the crime, and despite the mandatory nature and severity of the penalties under §§ 841(b)(1)(A) and (b)(1)(B), the majority concludes that § 841 requires that the government prove knowledge or intent only with respect to *a* controlled substance—indeed, only with respect to *any* controlled substance, not limited to the eight substances listed in §§ 841(b)(1)(A) and (b)(1)(B). I respectfully disagree.

The majority makes several arguments in support of its conclusion. I find none of them persuasive.

First, the majority writes that "§ 841(b)(1), unlike § 841(a), is silent as to any mens rea requirement." Maj. Op. at 23. It is of course true that §§ 841(b)(1)(A) and (b)(1)(B) do not contain a *mens rea* requirement. The requirement is in § 841(a)(1). But the "silence" to which the majority refers is a far cry from the true silence in *Staples*, where the statute had no *mens rea* requirement whatsoever. Yet the Court in *Staples*, relying on the presumption of *mens rea*, held that the statute required *mens rea* on the part of the defendant. *Staples*, 511 U.S. at 619.

Second, the majority writes, relying on "ordinary English grammar," that "[t]here is no natural or ordinary way to read the intent requirement in § 841(a)(1) as modifying the drug types and quantities in § 841(b)." Maj. Op. at 31. But the question before us is not centrally a grammatical question, to be answered as if we were diagramming a sentence. The question is a broader interpretive question. It is whether we should infer Congressional intent to require *mens rea* when

one subsection of the statute specifies a *mens rea* for criminal violations, including violations carrying mandatory sentences, and the immediately following subsections lists the controlled substances and quantities that require those mandatory sentences. If that is the question, as it surely must be, it is easy to read the statute in a "natural or ordinary way" to apply the *mens rea* requirement contained in one subsection to the criminal behavior specified in the immediately following subsections that impose mandatory sentences.

Third, the majority argues that the "knowingly or intentionally" *mens rea* in § 841(a)(1) cannot apply to controlled substances and quantities in §§ 841(b)(1)(A) and (b)(1)(B) because Congress explicitly provided for a *mens rea* of "knowingly or intentionally" in § 841(b)(6). The majority correctly points out "that Congress knew how to require proof of mens rea with respect to the predicate facts for sentences under § 841(b)," and that it did not explicitly provide that the *mens rea* requirement of "knowingly or intentionally" applied to crimes specified in § 841(b)(1)(A)–(B). Maj. Op. at 32. It incorrectly concludes, however, that if the "knowingly or intentionally" *mens rea* requirement contained in § 841(a)(1) applies to acts described in §§ 841(b)(1)(A) and (b)(1)(B), the identical *mens rea* specified in § 841(b)(6) is "surplusage." *Id.* According to the majority, "this redundancy fatally undermines the dissent's position." *Id.*

The majority misunderstands § 841(b)(6). There are two criminal acts specified in § 841(b)(6). It provides, "Any person who [1] violates subsection (a) . . . , *and* [2] knowingly or intentionally uses a poison, chemical or other hazardous substance on Federal land . . . shall be fined . . . or imprisoned not more than five years, or both." (Emphasis and bracketed numbers added.) The first criminal

act is a violation of § 841(a).  As we know, § 841(a) already contains the *mens rea* of "knowingly or intentionally," and it forbids manufacturing, distributing or dispensing controlled substances.  The second criminal act is poisoning federal lands.  It is a separate criminal act that is not forbidden by § 841(a).  Because it is a separate criminal act as to which the *mens rea* specified in § 841(a) does not apply, Congress separately specified the *mens rea* of "knowingly or intentionally" for that separate act.  Far from supporting the majority's conclusion, § 841(b)(6) is inconsistent with it.  For the first crime specified in § 841(b)(6), the *mens rea* of "knowingly or intentionally" is already provided in § 841(a)(1).  For the second crime, *mens rea* is not provided by § 841(a)(1).  Section § 841(b)(6) therefore explicitly provides that *mens rea*, in words that precisely replicate the *mens rea* in § 841(a)(1).  There is no surplusage.  Rather, there is a confirmation that the *mens rea* specified in § 841(a)(1) can apply to the crimes and mandatory penalties specified in § 841(b)(1).

Fourth, the majority suggests that the presumption of *mens rea* should apply only to acts that, absent the statute, are "entirely innocent."  Maj. Op. at 34 (quoting *Rehaif*, 139 S. Ct. at 2197).  It writes, "The presumption that Congress intended the defendant to possess a culpable mental state as to 'each of the statutory elements that criminalize otherwise innocent conduct' is particularly appropriate when a different reading would have the effect of criminalizing 'a broad range of apparently innocent conduct.'"  *Id.* at 28–29 (internal citations omitted).  The Supreme Court has never held that the presumption of *mens rea* protects only the entirely innocent.  Indeed, as Justice Kavanaugh wrote while a judge on the D.C. Circuit, it would be "illogical in the extreme" to limit the presumption of *mens rea* in this way.  *United States*

*v. Burwell*, 690 F.3d 500, 529 (D.C. Cir. 2012) (en banc) (Kavanaugh, J., dissenting).

The government has argued to the Court that the presumption of *mens rea* protects only the innocent, and its argument has been rejected. *See* Brief for the United States at 33–38, *Flores-Figueroa v. United States*, 556 U.S. 646 (2009) (No. 08-108), 2009 WL 191837. The government argued in *Flores-Figueroa* that the word "knowingly" in 18 U.S.C. § 1028A(a)(1) did not apply to a certain element of an aggravated identity theft crime because there was no risk of "criminalization of any 'apparently innocent conduct.'" *Id.* at 34 (quoting *Liparota v. United States*, 471 U.S. 419, 426 (1985)). But the Court refused to adopt that view.

I am, of course, aware that cases previously decided by our court support the majority's conclusion. *See*, *e.g.*, *United States v. Soto-Zuniga*, 837 F.3d 992 (9th Cir. 2016); *United States v. Jefferson*, 791 F.3d 1013 (9th Cir. 2015). I believe that these cases were wrongly decided. *See Jefferson*, 791 F.3d at 1019 (Fletcher, J., concurring). In recent years, the Supreme Court has paid increasing attention to statutory sentencing schemes. *See Alleyne,* 570 U.S. at 103; *Harris v. United States*, 536 U.S. 545 (2002), *overruled by Alleyne*, 570 U.S. at 103; *Apprendi,* 530 U.S. 466. *Alleyne* reflects a broad concern about the unfairness of sentencing schemes in which the facts that are legally essential to the punishment need not be found beyond a reasonable doubt. *See Alleyne*, 570 U.S. at 112 ("[I]f 'a statute prescribes a particular punishment to be inflicted on those who commit it under special circumstances which it mentions, or with particular aggravations,' then those special circumstances must be specified in the indictment[.]" (quoting 1 Joel Prentiss Bishop, Criminal Procedure § 598, at 360–61 (2d ed. 1872)).

It is a small step from *Alleyne* to the conclusion I would reach in this case. The same concern about unfairness that motivated the Court in *Alleyne* should lead us to the conclusion that the *mens rea* requirement specified in § 841(a)(1) applies to the acts and mandatory penalties specified in §§ 841(b)(1)(A) and (b)(1)(B). Congress did not intend in § 841 to impose mandatory sentences of five, ten and twenty years, and maximum sentences of life, based on mistakes of fact and unintentional acts.